UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

       Plaintiff,

  vs.                   REPORT AND RECOMMENDATION

Derrick Lamont Brown,

       Defendant.       Crim. No. 06-148 (01) (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Derrick Lamont Brown:

      1.    The Defendant's Motion to Suppress Evidence from Search.

      2.    The Defendant's Motion to Suppress Statements.

A Hearing on the Motions was conducted on June 14, 2006, at which time, the Defendant appeared personally, and by Craig S. Hunter, Esq.; and the Government appeared by Nathan P. Petterson, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion to Suppress Evidence of Search be denied, and that the Defendant's Motion to Suppress Statements be granted, in part, and denied, in part.[1]

## II.  Factual Background

The Defendant has been charged with one Count of conspiracy to distribute crack cocaine, in violation of Title 21 U.S.C. §§841(a)(1), (b)(1)(A), and 846; and one Count of possession with intent to distribute crack cocaine, in violation of Title 21 U.S.C. §§841(a)(1) and (b)(1)(A).  The events which gave rise to the conspiracy charge are said to have occurred in or about April of 2006, while the events giving rise to the possession with intent to distribute charge are said to have occurred on April 19, 2006.[2]  All of the events are alleged to have occurred in this State and District.  As

_____

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motions.  Leave was granted, and the last brief on the issues was received on June 23, 2006, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995).

[2]Following the Hearing on the Defendant's Motion, a Superseding Indictment issued, which charged a number of other individuals as co-conspirators with the Defendant, and which expanded the alleged conspiracy charge against the Defendant to include the time period from September of 2005, through May of 2006.  However, for the purposes of this Report and Recommendation, we limit our consideration to the issues that were presented in the Defendant's Motions, which were filed in

(continued...)

pertinent to the charges, and to the Motions now before us, the operative facts may be briefly summarized.[3]

At the Hearing, Matthew McShane ("McShane"), who is an officer with the Duluth Police Department, Steven Stracek ("Stracek"), who is a Sergeant with the Duluth Police Department, and Rodney Wilson ("Wilson"), who is an investigator with the Duluth Police Department, and the Lake Superior Drug and Gang Task Force, testified at the instance of the Government, while Jessica Jackson ("Jackson"), who

_____

[2](...continued)
response to the charges contained in the original Indictment, and the Defendant will be afforded an opportunity to submit additional pretrial Motions as to the charges alleged in the Superseding Indictment.

[3]Rule 12(d), Federal Rules of Criminal Procedure, provides that, "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

is the Defendant's girlfriend, testified at the request of the Defendant.[4]   The Defendant also testified on his own behalf.

On April 19, 2006, McShane was patrolling the area near Lake Avenue and Fifth Street in Duluth, Minnesota, when he observed the Defendant driving a silver Chevrolet Monte Carlo.   McShane had previously initiated traffic stops of the same vehicle, in December of 2005, and in early April of 2006.   During the first traffic stop, which had occurred in December of 2005, McShane had discovered a quantity of crack cocaine, and approximately $6,000.00 in cash, in the Defendant's possession.

_____

[4]The Government objected to Jackson's testimony on the ground that Jackson had not been sequestered, and counsel for the Defendant had previously represented that he did not intend to call any witnesses other than the Defendant.   Counsel for the Defendant confirmed his previous intention, but he expressed his desire to elicit pertinent testimony from Jackson.

Except for certain specific exceptions, which are not applicable here, Rule 615, Federal Rules of Evidence, requires the sequestering of witnesses upon the request of the parties.   As such, considering the representations of counsel for the Defendant, Jackson's presence in the Courtroom during the entirety of the Hearing would certainly justify the exclusion of her testimony.   See, United States v. Simms, 1990 WL 41997 at *2-3 (4th Cir., March 28, 1990)(affirming District Court's decision to disallow testimony of the defendant's girlfriend who was present in the Courtroom during Trial, where the Government had moved to sequester all of the defendant's witnesses pursuant to Rule 615).   As an exercise of discretion, we allowed Jackson's testimony, which we now find to be of limited relevance to the Defendant's Motions. Moreover, we have considered Jackson's presence in the Courtroom, during the Defendant's testimony, in our assessment of her believability.

- 4 -

McShane effected the second traffic stop in early April of 2006, when he observed the vehicle turn without activating its turn signal.  At the time of that stop, the Defendant was a passenger in the vehicle, which was being driven by Jackson.

After observing the silver Monte Carlo on April 19, 2006, McShane, who was located approximately two (2) blocks away from the vehicle, began to pursue, upon his belief that the Defendant occupied the vehicle, and that the Defendant was a drug dealer.  McShane observed the Defendant's vehicle travel several blocks before eventually making its way back to the vicinity of Lake Avenue and Fifth Street. McShane testified that he increased his speed, in order to catch the Defendant's vehicle, which appeared to be traveling at a high rate of speed.  McShane observed the Defendant make a right hand turn into an alleyway, between Fourth and Fifth Street, without signaling the turn.  The Defendant proceeded to make a left hand turn at the end of the alleyway, onto First Avenue West, again without using his traffic signal. Based on these violations of Minnesota law, see, <u>Minnesota Statute Section, 169.19, Subdivision 5</u>,[5] McShane activated the emergency lights on his squad car, and the Defendant pulled his vehicle into a parking spot along the side of the road.

_____

[5]Minnesota Statutes Section 169.19, Subdivision 5, requires as follows: "A signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning."

McShane and the Defendant both exited their respective vehicles. McShane advised the Defendant of the purpose for the traffic stop, and he requested that the Defendant provide him with his license and registration. The Defendant produced a driver's license, and a rental agreement for the vehicle. McShane brought the Defendant's driver's license, and the rental agreement, back to his squad car in order to conduct a check for outstanding Arrest Warrants, and to write a citation for the Defendant's failure to activate his turn signal. McShane further testified that, while the Defendant appeared to be traveling at a high rate of speed, he did not issue a citation for speeding, because he had not activated his radar device during his observation of the Defendant.

While McShane was at his squad car, Stracek arrived to assist with the stop. Stracek testified that he was engaged in a conversation with the Defendant while McShane was writing the citation, and that he learned that McShane had stopped the Defendant on a previous occasion, which had resulted in the discovery of crack cocaine. The testimony of both Stracek and McShane reflects that McShane walked from his squad car to the Defendant's vehicle, and then he returned the Defendant's license and registration materials to him. McShane explained the citation and, upon the Defendant's request, McShane provided the Defendant with the citation. McShane

then inquired as to whether the Defendant had anything on his person, by way of drugs or weapons, which would cause the officers concern. The Defendant responded by asking McShane whether McShane would like to search him. McShane proceeded to ask the Defendant whether he could search his person, and the Defendant stated something to the effect of "go ahead." McShane proceeded to search the Defendant's person, which resulted in the discovery of approximately $1,800.00 in cash, in the pocket of the Defendant's pants. McShane then asked the Defendant for permission to search his vehicle, and the Defendant agreed to the search.

At this point, McShane asked Stracek to take the Defendant back to the area by McShane's squad car, in order to allow McShane to safely conduct the vehicle search. Stracek and the Defendant proceeded towards the rear of the Defendant's vehicle, which was where McShane's squad car was located. Stracek testified that the Defendant, who was walking with the assistance of a cane, leaned against the squad car, and watched as McShane conducted the search. McShane testified that the Defendant appeared nervous, and that he repeatedly represented that there was nothing in the vehicle. At some point, the Defendant offered to open his trunk, and to let Stracek and another officer, who was identified as Officer Helgamo, search the contents of his trunk.

The search of the Defendant's vehicle resulted in the discovery of four (4) paddies of an off-white substance, which McShane believed to be crack cocaine. The narcotics were discovered in a brown paper bag, which was located in a hollow area of the compartment for the gear shifting mechanism. McShane accessed that area by lifting a cup holder, which was not fastened. McShane further testified that he felt hard objects inside of the bag prior to opening the bag.

After discovering the narcotics, McShane placed the Defendant under arrest. Both McShane and Stracek testified that the Defendant did not revoke his consent to the search at any time prior to the discovery of the narcotics, and that no threats or promises were made to elicit the Defendant's consent.

Following the arrest, McShane transported the Defendant back to the Police Station in his squad car. En route to the Police Station, the Defendant and McShane engaged in a conversation about the traffic stop, and the narcotics that had been discovered inside of the Defendant's vehicle. While McShane testified that he could not recall the exact details of the conversation, he did remember that the Defendant had persistently denied any knowledge of the presence of crack in the vehicle, and that McShane had advised the Defendant that the vehicle belonged to him, and that he was sure that "it" was his.

Upon his arrival at the Police Station, the Defendant was taken to an interview room.  Unbeknownst to the Defendant, the room was equipped with a video recording device, and McShane had instructed that the video recorder be activated.  The room contained a table and several chairs, and the Defendant was seated near the side of the table while McShane, who was seated on the other side of the table, began to inventory some of the items that had been recovered during the Defendant's arrest. See, Government Exhibit 1.  The Defendant inquired as to what was going to happen, and McShane explained that he was waiting for one of the investigators -- Wilson -- and that once Wilson arrived, the officers would provide the Defendant with an opportunity to speak with them, like the last time.[6]  Shelly Johnson ("Johnson"), who is a Sergeant with the Duluth Police Department, was intermittently present in the interview room during the time period when the Defendant and McShane were waiting for Wilson to arrive.

While they were waiting for Wilson, McShane completed forfeiture forms, and the Defendant made unsolicited statements concerning his authorization to search his

---

[6]McShane's statements concerning "the last time" appear to be a reference to an interview of the Defendant, which occurred following his arrest, in December of 2005.  According to the testimony of McShane, the Defendant was released following the interview in December, and McShane was unsure of whether any charges had resulted from that incident.

person, and the vehicle.  Specifically, the Defendant  persisted that he did not know

about the existence of crack cocaine in his vehicle, and he inquired as to the logic

behind his authorization for McShane to search his person, and the vehicle stating, "I

let you search the car," and "I could have told you 'no'."  McShane responded to the

Defendant's statement by noting that the Defendant had agreed to the search.  Just

seconds later, the Defendant stated "Why would I let you search the car if I knew that

I had something in it," and "I could have just told you 'no'."   McShane again

responded to the Defendant's statement by noting that the Defendant had not declined

his requests to search, at which time, the Defendant appeared to deny that he had

consented to the search of his vehicle.  However, almost immediately thereafter, the

Defendant agreed with McShane that he had consented to the search of his person, and

of his vehicle.

The Defendant continued to deny any knowledge of the crack cocaine which

was found in his vehicle.  McShane told the Defendant that he was not being honest;

that he had not been honest in the interview of December of 2005; that he should just

"sit tight" until Wilson arrived; and that he would be given an opportunity to speak

at that time.  The Defendant persisted in stating that he did not have any knowledge

about the crack cocaine, and asked McShane to tell him why he was at the Police

Station.  McShane reiterated that the Defendant was not being honest, and that, if he was, he would not be denying his knowledge of the crack cocaine.  McShane told the Defendant that he was aware that the Defendant had been participating in narcotics related activities for some time, and that McShane possessed more knowledge about the Defendant's drug related activities than the Defendant was aware.  McShane then advised the Defendant not to "kid" himself, and not to "kid" McShane.

Just prior to Wilson's arrival, the Defendant inquired, "Can I call my lawyer?"  McShane initially responded "Not right now," but then immediately asked, "Do you want to talk to your lawyer, or do you want to talk to us?"  McShane proceeded to advise the Defendant that if he wanted to talk to his lawyer, then the interview would be done, but that, if he wanted an opportunity to talk to the officers, it would be necessary to clarify that he did not want to talk to his attorney.  McShane continued to explain to the Defendant that if he wanted to talk with his attorney that it would be fine, and well within his rights to do so, but that if he wanted to speak with the officers that this was his opportunity to do so.

After approximately twenty-two (22) minutes, Wilson arrived at the interview room.  McShane explained to Wilson that the Defendant had asked to call his lawyer, and that he was attempting to clarify whether the Defendant wished to speak with an

attorney, or to speak with the officers.  Wilson proceeded to explain some of the investigation of the Defendant that had taken place.  In doing so, Wilson represented that an ongoing investigation of the Defendant had taken place, since December of 2005, and that the Defendant, as well as a number of other persons, whom the Defendant was known to associate with, had been observed selling narcotics in controlled transactions.  Wilson continued to explain that he had been working with the United States Attorney, on a possible prosecution for Federal charges, and that, if he wanted to speak with the officers, that this would be his opportunity to do so, and to potentially help himself.  The Defendant responded by saying, "Okay, we can talk," and he proceeded to deny knowledge of the possession of the crack cocaine that was discovered in his vehicle.

Up until this time, the Defendant had not been advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).  McShane and Wilson then left the room, in order to allow McShane an opportunity to debrief Wilson.  Upon their return, Wilson asked the Defendant whether he had been arrested before, and whether he understood that the officers were required to advise him of his rights.  The Defendant responded affirmatively to both of those statements.  Wilson proceeded to inform the Defendant that he wanted to ask the Defendant some questions, but that, in order to

do so, he needed to advise the Defendant of his rights. The Defendant told Wilson that he could ask him any questions that he wanted. McShane proceeded to advise the Defendant of his Miranda rights using a standard issue card. McShane then asked the Defendant whether he understood his rights, and whether he would be willing to talk to the officers. The Defendant told the officers to ask him questions, at which time, Wilson clarified with the Defendant that he understood his rights.

During the interview, the Defendant made a number of incriminating statements. The Defendant also reiterated, on multiple occasions, that he could have refused McShane's requests to search his person, and his vehicle, but that he did not, and instead he chose to accede to McShane's request. After approximately forty-five (45) minutes, Wilson and McShane started to leave the room. The Defendant called Wilson back, and requested to speak to Wilson alone. McShane left the room. During the subsequent interaction between Wilson and the Defendant, the Defendant made further incriminating statements, and he again reiterated that he could have refused McShane's requests to search, but that he did not. The Defendant's statements were made in an attempt to convince the officers that he was unaware of the crack cocaine that had been discovered in his vehicle.

The entire interview lasted approximately one (1) hour and seven (7) minutes, and it ended when Wilson finished asking the Defendant questions.  No threats or promises were made during the course of the interview and, aside from his initial exchange with McShane, the Defendant did not request to speak to an attorney, or otherwise express a desire to terminate the interview.

The Defendant's testimony presents a somewhat varied account of the events which resulted in his arrest, on April 19, 2006, as well as the previous traffic stops of December of 2005, and early April of 2006.  Specifically, the Defendant's testimony is consistent with that of McShane that he was stopped by McShane for his failure to activate his turn signal.  However, the Defendant testified that, following the stop, he got out of his car, and that McShane drew his firearm, and directed the Defendant to get back into his vehicle.  The Defendant testified that three (3) other officers arrived shortly thereafter, and that he got back inside of his car.  As McShane approached, the Defendant asked McShane why McShane was harassing him.[7]  According to the

---

[7]The Defendant's perception that McShane was harassing him was apparently based on the two (2) previous traffic stops of the Defendant, that McShane had effected.  The Defendant asserted that McShane first stopped him in December of 2005, for having snow in his back window.  The Defendant contends that, during that stop, McShane searched him, without consent, and that search resulted in the discovery of both crack cocaine and money.  At some point during that encounter, the
(continued...)

- 14 -

Defendant, McShane told the Defendant that he was harassing the Defendant because the Defendant was black and was from Detroit, and that all black guys from Detroit are drug dealers.

The Defendant further testified that, after McShane had given him the citation, McShane asked the Defendant what was in his pockets, and then started to pat the Defendant's clothing.  The Defendant contends that he asked McShane whether he was going to search him, that McShane told him "yes," and that McShane began to

---

[7](...continued)
Defendant testified that McShane stated, "all black guys from Detroit are drug dealers."  Following the stop, the Defendant was transported to the Police Station, where he answered some questions, and was released.  According to the Defendant, no charges resulted from that incident.

The Defendant testified that McShane also stopped him just four (4) days prior to the stop on April 19, 2006.  During that stop, the Defendant was the passenger of the vehicle being driven by Jackson.  The Defendant maintains that McShane stopped Jackson for failing to activate her turn signal.  According to the Defendant, McShane then took both his and Jackson's driver's licenses, and asked the Defendant to get out of the vehicle.  Apparently, the Defendant asked McShane whether he was harassing him, and McShane told him that he was.  McShane then began to search the Defendant, without consent, at which time Jackson interjected to ask the officer what he was doing.  The Defendant testified that McShane told Jackson to roll up the window, or he would take her to jail.  In contrast to the Defendant's testimony, McShane testified that, during the traffic stop in early April of 2006, the Defendant originally consented to a search of his person, but that he revoked his consent during the search, and that McShane ceased his search of the Defendant at that time.

search the Defendant.  The Defendant denies that he ever offered to allow McShane to search his person, or that he consented to the search of his vehicle.

According to the Defendant, after McShane discovered money on the Defendant's person, he directed the Defendant to the rear of the vehicle where McShane's squad car was located, and that one of the other officers directed him to place his hands on the vehicle.  The Defendant testified that he did not feel free to leave, and that he was afraid for his safety.

The Defendant further testified that approximately fifteen (15) to twenty (20) minutes after the commencement of the vehicle search, McShane placed him under arrest, and transported him to the Police Station.  En route to the Police Station, McShane apparently told the Defendant that the process would be similar to the last time -- in an apparent reference to the interview which took place in December of 2005.  The Defendant also testified that McShane asked him where he got "it" from, and that the Defendant inquired as to what McShane was referencing by his use of the word "it."  Assertedly, McShane then stated something to the effect of "Don't worry, wait until we get to the Station."

Jackson also testified at the request of the Defendant, concerning the traffic stop which occurred in early April of 2006.  According to Jackson's testimony, McShane

stopped a vehicle that she was driving approximately four (4) days prior to the traffic stop of April 19, 2006.  The stop was apparently initiated because Jackson had failed to signal a turn.  Jackson testified that McShane initially took her and the Defendant's licenses, and that, when he returned their licenses, he directed the Defendant to exit the vehicle.  Jackson further testified that, once the Defendant was outside of the vehicle, McShane started to search the Defendant.  When Jackson inquired as to what McShane was doing, McShane purportedly told her that he was not talking to her, and he instructed her to roll up her window.  As recalled by Jackson, McShane continued to search the Defendant, and then allowed Jackson and the Defendant to leave.

III.  Discussion

A.    The Defendant's Motion to Suppress Evidence of Search.

1.    Standard of Review.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable * * * subject only to a few specifically established and well delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) [internal quotations omitted].  However, "'[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.'"  United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002), cert. denied 537 U.S. 1022 (2002),

quoting <u>United States v. Jenkins</u>, 92 F.3d 430, 436 (6th Cir. 1996), cert. denied, 420

U.S. 1170 (1997), citing <u>Schneckloth v. Bustamonte</u>, supra at 218.  "Whether or not

the consent was voluntary must be established by examining the totality of the

circumstances, including '"both the characteristics of the accused and the details of

the interrogation."'"   <u>United States v. Bradley</u>, 234 F.3d 363, 366 (8th Cir. 2000),

quoting <u>United States v. Chaidez</u>, 906 F.2d 377, 380-81 (8th Cir. 1990), quoting, in

turn, <u>Schneckloth v. Bustamonte</u>, supra at 226.  "We consider the following

characteristics of the individual to determine whether their [sic] consent was truly

voluntary: age, intelligence, intoxication, advice of Miranda rights, and previous

arrests."  <u>United States v. Reinholz</u>, 245 F.3d 765, 780 (8th Cir. 2001), citing <u>United</u>

<u>States v. Chaidez</u>, supra at 381; see also, <u>United States v. Urbina</u>, 431 F.3d 305, 309

(8th Cir. 2005); <u>United States v. Alcantar</u>, 271 F.3d 731, 737 (8th Cir. 2001), cert.

denied, 535 U.S. 964 (2002).

　　In addition to the characteristics of the defendant, "[w]e also consider the

following characteristics of the environment in which the individual's consent was

given, so as to determine whether their [sic] consent was truly voluntary:  length of

detention, threats and misrepresentations by police, whether the individual is in

custody or under arrest, whether it is a public or private place, and the suspect's

contemporaneous objections and representations."   United States v. Reinholz, supra

at 780; see also, United States v. Va Lerie, 424 F.3d 694, 709 (8th Cir. 2005), cert.

denied, --- S.Ct ----, 2006 WL 1725633 (U.S., June 26, 2006); United States v.

Mendoza-Cepeda, 250 F.3d 626, 629 (8th Cir. 2001)(listing factors to be considered

as to voluntariness of consent to search).  Ultimately, "[c]onsent is voluntary if it was

"'the product of an essentially free and unconstrained choice by its maker,'" * * *

rather than 'the product of duress or coercion, express or implied.'"   United States v.

Bradley, supra at 366, quoting United States v. Chaidez, supra at 380, quoting, in turn,

Schneckloth v. Bustamonte, supra at 225, 227.   "[T]he question of whether a consent

to search was in fact 'voluntary' or was the product of duress or coercion, expressed

or implied, is a question of fact to be determined from the totality of all

circumstances."   Schneckloth v. Bustamonte, supra at 227; see also, United States v.

Fleck, 413 F.3d 883, 891-92 (8th Cir. 2005).  The Government has the burden to show,

by a preponderance of the evidence, that a defendant's consent was voluntary.  See,

United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005), citing United States v.

Cedano-Medina, 366 F.3d 682, 684-85 (8th Cir. 2004); United States v. White, 81 F.3d

775, 780 (8th Cir. 1996).

2.   <u>Legal Analysis</u>.  Here, the Defendant has moved to suppress the evidence that was acquired during the search of his person, and of his vehicle, following the traffic stop of April 19, 2006.  In so moving, the Defendant concedes that "a traffic violation -- however minor -- creates probable cause to stop the driver of a vehicle," <u>United States v. Fuse</u>, 391 F.3d 924, 927 (8th Cir. 2004), quoting <u>United States v. Barry</u>, 98 F.3d 373, 376 (8th Cir. 1996), quoting, in turn, <u>United States v. Barahona</u>, 990 F.2d 412, 416 (8th Cir. 1993), and that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause  * * * [t]hat is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004).  Accordingly, irrespective of his subjective motivations, McShane had probable cause to stop the Defendant's vehicle when he observed the vehicle fail to signal a turn, in violation of Minnesota Statutes Section 169.19, Subdivision 5.

Nevertheless, the Defendant maintains that McShane exceeded the lawful bounds of the traffic stop when he searched the Defendant's person and his vehicle. Specifically, the Defendant maintains those searches were conducted without probable cause, and without voluntary consent.  The Government maintains that the Defendant voluntarily consented to both the search of his person, and the search of his vehicle,

and that he did not withdraw that consent at any time prior to the discovery of contraband.

As support for its position, the Government has drawn our attention to the Hearing testimony of both McShane and Stracek, that the Defendant offered to let McShane search his person, and that, upon McShane's request, the Defendant consented to a search of his vehicle. The Government has also noted the multiple instances prior to, and during, the Defendant's interview with McShane and Wilson, in which the Defendant represented that he gave McShane permission to search his person and his vehicle. In contrast, the Defendant testified that he did not provide McShane with consent to search either his person or his vehicle. The Defendant further maintains that McShane's subjective motivations for initiating the traffic stop -- namely his belief that the Defendant was a drug dealer -- as well as his previous stops of the Defendant, suggest that McShane falsified his testimony concerning the Defendant's consent.

As a result of the conflicting testimony, an unavoidable credibility determination heavily influences the result we reach. In assessing the believability of Stracek, McShane, and the Defendant, we have weighed their demeanor, and the consistency of their testimony with both common sense, and with the Record as a

whole. We are persuaded that Stracek and McShane are the more believable witnesses. Both deported themselves well as witnesses, responded directly, and forthrightly, to the questions asked, their testimony was relatively consistent, and was corroborated, at least on this Record, by the representations that were made by the Defendant during his videotaped interview, shortly after his arrest. Furthermore, the Defendant has not drawn anything to our attention so as to suggest that McShane or Stracek have any past record of falsification, dishonesty, or perjury.[8]

On the other hand, we are not persuaded that the Defendant is fully believable. Notably, as is demonstrated by the Indictment in this matter, a Grand Jury has found probable cause to believe that the Defendant has engaged in significant criminal activity, in the recent past and, if convicted on the pending charges, the Defendant would face a potentially lengthy sentence which, in itself, creates some incentive for

---

[8]While the testimony of Jackson and the Defendant raises the possibility that McShane might have exceeded the bounds of the Fourth Amendment, during previous traffic stops of the Defendant, we find such testimony to be insufficient to demonstrate that McShane was dishonest in his testimony concerning the Defendant's consent to the search on April 19, 2006. Specifically, McShane's testimony concerning the Defendant's consent was consistent with that of Stracek, as well as the Defendant's own representations during his recorded interview. Therefore, even if we were to credit the testimony of Jackson and the Defendant, concerning the details of the two previous traffic stops -- which we do not -- we would still find the testimony of McShane and Stracek to be credible, as it pertains to the Defendant's consent to the search of his person, and his vehicle.

him to provide false testimony.  Moreover, the Defendant's testimony of the events which surrounded the search of his person, and his vehicle, are inconsistent with the representations that he made during his videotaped interview with McShane and Wilson -- namely, his repeated observation that he could have, but had not, refused McShane's request to search his person and vehicle.  Furthermore, the Defendant conceded, on cross examination, that he did not have a clear recollection of the events which occurred on April 19, 2006, and the Defendant's recollection of statements that were made by and to him, during the videotaped interview were inconsistent with the statements that were contained on the video itself.

Crediting the testimony of McShane and Stracek, we find that the Defendant voluntarily consented to the search of his person, and of his vehicle.  At the time of those searches, McShane had returned the Defendant's driver's license and registration documents to him; he had given the Defendant the citation for failing to use his turn signal; and, according to the testimony of McShane, the Defendant was free to leave.[9]  Moreover, while the Defendant had not been advised of his rights

---

[9]While the Defendant testified that he did not feel free to leave, his statement to Wilson and McShane during the subsequent interview suggests otherwise.  Notably, the Defendant represented, in that interview, that, after he was given the citation by McShane, he could have left without agreeing to the search.

under <u>Miranda</u>, and his right to refuse the McShane's requests to search, nothing in the Record suggests that McShane, Stracek, or Officer Helgamo, employed any strong-arm tactics, or duplicity, to obtain the consent of the Defendant. On the contrary, both the testimony of McShane and Stracek demonstrate that, when asked whether he was in possession of anything that the officers should have been concerned about, the Defendant offered to allow McShane to search his person, and that, after the discovery of a large amount of cash in the pocket to the Defendant's pants, the Defendant, upon the request of McShane, authorized the search of his vehicle. Such testimony is corroborated by the representations that were made by the Defendant during his interview with McShane and Wilson.

The Record is also bereft of any evidence that the Defendant's personal characteristics somehow rendered his consent involuntary. Notably, there is no evidence that the Defendant was intoxicated, or that the Defendant was of such limited intelligence that he could not effectively consent to the search. The Defendant appears to be well beyond the age of majority[10] and, based upon the Defendant's

---

[10]In his interview with Wilson and McShane, the Defendant represented that he was thirty-six (36) years old, and our review of the file discloses that the Defendant informed the Pretrial Services officer that he was thirty-seven (37) years old.

representations during his interview with Wilson and McShane, there is at least some suggestion that the Defendant had been arrested in the past.

Accordingly, based on the totality of the circumstances, we find that the Defendant voluntarily consented to the search of his person, and of his vehicle, on April 19, 2006.  Moreover, the Defendant did not, at any time, revoke his consent to either the search of his person, or the vehicle.  Therefore, having found that the traffic stop of the Defendant's vehicle was supported by probable cause, and that the searches of the Defendant's person and his vehicle were authorized by his voluntary consent, we recommend that the Defendant's Motion to Suppress Evidence of Search be denied.

B.    The Defendant's Motion to Suppress Statements.

1.    Standard of Review.  Government agents are not required to administer Miranda warnings to everyone whom they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).    Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v.

Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).

If a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning." Davis v. United States, 512 U.S. 452, 457 (1994). To exercise that right, however, a suspect "must unambiguously request counsel," which "'requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" Id. at 459, quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning." Id. [emphasis in original]. In addition, "the Sixth Amendment right to counsel 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Von Kahl v. United States, 242 F.3d 783, 789 (8th Cir. 2001), quoting McNeil v. Wisconsin, supra at 175.

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the

knowing and intelligent waiver standard.'" Davis v. United States, supra at 458, quoting Edwards v. Arizona, 451 U.S. 477, 483 (1981). Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994). The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights. See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987). However, "Miranda has no application to statements * * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990), citing United States v. McGauley, 786 F.2d 888, 891 (8th Cir. 1986), and United States v. Webster, 769 F.2d 487, 492 (8th Cir. 1985).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine

"'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").   The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing."   Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v.

- 28 -

Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).

2.    Legal Analysis.   The Defendant's Motion seeks to suppress "any statements made by the defendant to law enforcement, on the basis that such statements were obtained in violation of the defendant's constitutional rights."   The Defendant does not specify the grounds upon which suppression of his statements is sought, and the only legal argument that has been offered by the Defendant, in support of his Motion to Suppress Statements, suggests that his Motion is predicated on his assertion that the statements were the fruits of the search of the Defendant's person, and of his vehicle, and the resulting arrest.  See, Defendant's Memorandum in Support of Motion to Suppress, at p. 4, Docket No. 18.

For reasons previously addressed, we have found no Fourth Amendment violation in the search of the Defendant's person, or of his vehicle, and therefore, it would be improper to suppress the Defendant's statements on the ground that they were the product of an unlawful search and seizure.  However, considering the Record that was presented at the Hearing, the absence of a Fourth Amendment violation should not end our analysis.  Specifically, further attention is required as to whether the Defendant's rights, under Miranda, were violated during the exchange between the

- 29 -

Defendant and McShane, which occurred prior to the Defendant being advised of his Miranda rights, and whether the Defendant's Fifth Amendment right to counsel, as set forth in Edwards v. Arizona, supra, was violated following the Defendant's request to call his attorney.

The Record reflects that McShane and the Defendant engaged in a conversation in McShane's squad car, while the Defendant was being transported to the Police Station.   McShane testified that he did not recall the precise contents of this conversation, but that he does remember that the Defendant persisted in his representations that he had no knowledge of the narcotics that were discovered in his vehicle, and that McShane responded by advising the Defendant that he knew that the vehicle belonged to him, and that "it" belonged to him.  The Defendant testified that this conversation involved, in pertinent part, questions by both he and McShane, and that at one point, McShane inquired as to where the Defendant got "it" from, and that he responded by stating, "where did I get what from."

It is unclear from the parties' submissions as to whether the Defendant made any incriminating statements during his conversation with McShane, in the squad car,

or whether the Government intends on proffering those statements at Trial.[11]   The

absence of clarity has been further exacerbated by the Defendant's failure to

specifically articulate the scope of his Motion, and the parties' mutual failure to

address the issue in their respective memoranda.   Nevertheless, the Record before us

demonstrates that the conversation which occurred in McShane's squad car took place

while the Defendant was in custody, and without the benefit of a <u>Miranda</u> warning.

As a result, the issue before us is whether the exchange that occurred, between

McShane and the Defendant in McShane's squad car, was interrogation, as defined

by the Supreme Court in <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980), where the

Court held that "Miranda safeguards come into play whenever a person in custody is

subjected to either express questioning or its functional equivalent."   The Supreme

Court explained that interrogation did not only refer "to express questioning, but also

to any words or actions on the part of the police (other than those normally attendant

---

[11]Considering McShane's testimony, that he does not remember the exact contents of his conversation with the Defendant in his squad car, and that the Defendant and McShane were the only persons who were in the squad car at the time that the conversation took place, it seems highly unlikely that the Government will proffer any statements that were made by the Defendant during that conversation. Nonetheless, we decline to make such an assumption, in the absence of an express representation by the Government.

to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id.

In Rhode Island v. Innis, supra at 301, the Supreme Court instructed Courts that, when considering whether a law enforcement officer's words, or acts, were such that the officer should have known that they were reasonably likely to elicit an incriminating response, the focus should be "primarily upon the perception of the suspect, rather than the intent of the police," because "Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police."  However, the Supreme Court also noted that, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Id.  Thus, the question devolves to whether the conversation, that occurred between McShane and the Defendant, would have been perceived as interrogation by a reasonable person under the circumstances then confronting the Defendant.  See, Holman v. Kemna, 212 F.3d 413, 420 (8th Cir. 2000), cert. denied, 531 U.S. 1021 (2000).

Necessarily, our analysis is case-specific for, in "[d]etermining whether particular statements or practices amount to interrogation depends on the circumstances of each case, particularly whether the statements are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given." United States v. Hephner, 103 Fed.Appx. 41, 48 (8th Cir., June 4, 2004), citing Rhode Island v. Innis, supra at 300-02; see also, United States v. Allen, 247 F.3d 741, 765 (8th Cir. 2001), rev'd on other grounds, 536 U.S. 953 (2002).

Here, the precise contents of the conversation which occurred in McShane's squad car were not identified by either the Defendant or McShane.  However, the Defendant testified that McShane asked him, "Where did you get it from," in an apparent reference to the crack cocaine which was discovered in the Defendant's vehicle.  Plainly, such express questioning, in the context of a conversation about the narcotics that were discovered in the Defendant's vehicle, was designed to elicit an incriminating response, and therefore, it constituted interrogation.

McShane also testified that, in response to the Defendant's assertions of being unaware of the presence of the crack cocaine, which had been discovered in the Defendant's vehicle, that he told the Defendant that he knew that the vehicle was his

and that he was sure that "it" was his.  Considering that context of the conversation

involved the discovery of narcotics in the Defendant's vehicle, such a statement, while

not express questioning, was also reasonably likely to elicit an incriminating response.

See, United States v. Medrano, 208 F. Supp.2d 681, 685 (W.D. Tex. 2002) (officer's

statement that he found it "unusual" that the defendant's fifteen (15) year old brother

owned a car, in a context where ownership of the vehicle was an integral fact in a

criminal action, was reasonably likely to evoke an incriminating response).  Therefore,

to the extent that the Defendant made any inculpatory statements, in response to

McShane's inquiry as to where he got "it" from, or to the statement that he knew that

"it" belonged to him, we recommend that his Motion be granted.

Once the Defendant was at the Police Station, he was placed in an interview

room, where he was required to wait for approximately twenty-two (22) minutes until

the arrival of Wilson.  McShane was present in the interview room during the entirety

of the waiting period, while Johnson intermittently entered and exited the room during

that time.  The Defendant was advised, during that time, that he would have an

opportunity to speak with the officers once Wilson arrived, and to just "sit tight."  The

Defendant made several unsolicited statements during that time and, upon his

questioning as to why he was there, McShane informed the Defendant that the Defendant had not been honest with him.

As noted, the Defendant does not identify any specific constitutional infirmity in this exchange between McShane and the Defendant, nor is any infirmity immediately apparent on the Record presented.  While the Defendant had not been advised of his <u>Miranda</u> rights at that time, his statements to McShane were unsolicited.  Moreover, McShane did not engage the Defendant in any questioning concerning the Defendant's narcotics related activities and, to the extent that McShane made statements which could be construed as being reasonably likely to evoke an incriminating response, our review of the videotape discloses that the Defendant did not make any such response.  See, <u>Government's Exhibit 1</u>.  Therefore, to the extent that the Defendant's Motion seeks to suppress the statements that were made by the Defendant prior to the commencement of the interview, we recommend that the Motion be denied.

Just prior to Wilson's arrival, the Defendant asked McShane, "Can I call my lawyer?"  McShane responded to the Defendant's inquiry by stating, "Not right now," but then immediately asked, "do you want to talk to your lawyer, or do you want to talk to us?"  McShane proceeded to advise the Defendant that, if he wanted to talk to

his lawyer, then the interview would be done, but that, if he wanted an opportunity to talk to the officers, then it would be necessary to clarify that he did not want to talk to his attorney.  McShane continued to explain to the Defendant that, if he wanted to talk to his attorney that it would be fine, and well within his rights to do so, but that if he wanted to talk to the officers that this was his opportunity.

Wilson arrived while McShane was asking the Defendant whether he wanted to contact his attorney or whether he wanted to speak with the officers.   The Defendant stated that he wanted to know what Wilson wanted to talk to him about, and Wilson responded by discussing the traffic stop, which had occurred in December of 2005, and the ensuing investigation of the Defendant for narcotics related activities. Wilson advised the Defendant that the Defendant had been observed participating in controlled drug transactions, as had other persons who were known to be associates of the Defendant.   Wilson further advised the Defendant that he had been working with the United States Attorney on charges against the Defendant, and his cohorts, and that he was going to give the Defendant an opportunity to talk, and to help himself by talking about his activities, and the activities of his associates.  Wilson repeated some of the evidence that had been acquired against the Defendant, and he reiterated that

the Defendant would be subject to Federal prosecution.   Wilson then told the Defendant that Wilson would give the Defendant an opportunity to talk.

Following Wilson's statement, the Defendant advised the officers that he was willing to speak with them.   A brief period of time elapsed, where Wilson and McShane both left the interview room.   Wilson and McShane then returned to the room, and Wilson told the Defendant that he wanted to ask the Defendant some questions, and he asked the Defendant whether he wanted to keep talking.   The Defendant responded by telling Wilson that he could ask him questions and that he would answer them.   The Defendant was then advised of his Miranda rights, and he agreed to speak with the officers.   The Defendant subsequently answered Wilson's and McShane's questions, and made several incriminating statements.

Pursuant to Edwards v. Arizona, in the context of the Fifth Amendment, "[a] suspect who invokes the Miranda right to counsel may not be reapproached by police unless counsel is made available."   United States v. Harris, 221 F.3d 1048, 1051 (8th Cir. 2000).   However, as we have previously noted, in order to successfully invoke a right to counsel, a suspect's request must be unambiguous, and unequivocal.   See, Davis v. United States, supra at 459; McNeil v. Wisconsin, supra at 178. Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or

equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning." Id. [emphasis in original]. Accordingly, the question presented is whether the Defendant's statement, "Can I call my lawyer?" constituted an unequivocal invocation of his right to counsel. We find that it did not.

In order to invoke his right to counsel, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, supra at 459. Applying this standard, the United States Court of Appeals for the Seventh Circuit recently held that the question, "Can I have a lawyer," was an invocation of the right to counsel. See, United States v. Lee, 413 F.3d 622, 626 (7th Cir. 2005). Similarly, Courts have held that a statement such as "maybe I should talk to an attorney by the name of William Evans," see, Abela v. Martin, 380 F.3d 915, 926-27 (6th Cir. 2004), and "I'd just as soon have an attorney," see, Kyer v. Carlton, 146 F.3d 374, 379 (6th Cir. 1998), also constitute unequivocal invocations of the right to counsel. See also, Alvarez v. Gomez, 185 F.3d 995, 998 (9th Cir. 1998)(finding the defendant's three questions: "Can I get an attorney right now," "You can have an attorney right now," and "Well, like right now you got one," together constituted an

unequivocal invocation); <u>United States v. Johnson</u>, 400 F.3d 187, 195 (4th Cir. 2005) (holding that suspect who checked "no" on a form which asked whether he "want[ed] to make a statement without his lawyer at this time," unequivocally invoked right to counsel ); <u>United States v. Miller</u>, 2005 WL 8475323 at 3 (D. Neb., December 20, 2005)("There is nothing unclear or equivocal about the statement 'I want to talk to my lawyer.'").

By way of contrast, the statement "Maybe I should talk to a lawyer," that was presented to the Supreme Court in <u>Davis v. United States</u>, supra at 455, was deemed equivocal, as were the statements "Do you know any good attorneys," see, <u>United States v. Kelly</u>, 329 F.3d 624, 630 (8th Cir. 2003), "I think I would like to talk to a lawyer," <u>Clark v. Murphy</u>, 331 F.3d 1062, 1065 (9th Cir. 2003), and "I think I need a lawyer," <u>Burket v. Angelone</u>, 208 F.3d 172, 198 (9th Cir. 2000).  See also, <u>United States v. Syslo</u>, 303 F.3d 860, 867 (8th Cir. 2002)(finding statement "I don't think I need an attorney for this" was equivocal); <u>United States v. Ramirez</u>, 2002 WL 31933026 at *6-8 (S.D. Iowa, April 16, 2002)(holding that the defendant's question to an officer of whether he thought that the defendant needed an attorney was equivocal); <u>United States v. Segal</u>, 207 F. Supp.2d 835, 841 (N.D. Ill. 2002)(holding that the defendant did not invoke his right to counsel, when he told the officers "you

can talk to my lawyer"); <u>Williams v. Larson</u>, 2003 WL 1785807 (N.D. Cal., March 31, 2003)(holding that the defendant's statement, that he had talked to counsel who had told him not to talk, was not an invocation of the right to counsel); <u>United States v. Sprouse II</u>, 2002 WL 15866 (W.D. Va., January 8, 2002)(same); cf., <u>Bruni v. Lewis</u>, 847 F.2d 561, 564 (9th Cir. 1988)(holding that the defendant did not unambiguously invoke his right to counsel when he stated, in response to an officer's request that he answer questions, "[n]ot without my attorney," and then immediately added, "[w]ell, ask your questions and I will answer those I see fit").

In the context of a Habeas Petition, our Court of Appeals was recently presented with the question of whether a State Court's finding, that the statement, "Could I call my lawyer," was equivocal, constituted an unreasonable application of clearly established Federal law. See, <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 805 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001). In its analysis, the Court noted that the State Court's conclusion was premised upon the principle announced in <u>Davis</u>, and the State Court had concluded that the Petitioner did not request the assistance of counsel, but only requested to call his attorney. The Court also noted that, since the interviewing officer had answered "yes" to the petitioner's question of whether he could call his lawyer, the State Court had found that the petitioner "was given the opportunity [to

call an attorney], and for reasons only known to him, declined to do so." Id. at 803-04.  Based on these findings, the Court held that the State Court's conclusion, that the petitioner's statement was equivocal, and did not constitute an unreasonable application of clearly established Federal law -- reversing the holding of the District Court to the contrary.  Id. at 805 ("[Petitioner's] question was not such a clear and unambiguous request for counsel that [the investigating officer] was required to stop his interrogation."); see also, United States v. Eastman, 256 F. Supp.2d 1012, 1019 n. 6 (D. S.D. 2003)(finding, in dicta, that the question, "Can I have a lawyer" "[w]as not an unequivocal request for counsel within the meaning of Davis and its progeny"), citing 2 W. LeFave, J. Israel, N. King, Criminal Procedure, §6.9(g) at pp. 609-112, n. 148; but see, United States v. Lee, supra at 626 (statement, "Can I have my lawyer" was proper invocation of Miranda).

Here, the question posed by the Defendant, "Can I call my lawyer," was materially indistinguishable from that presented in Dormire, and was, therefore, equivocal in the sense that it was reasonable for the officers to conclude that the Defendant was asking whether he could contact his attorney, rather than an expression of the Defendant's desire not to talk to the officers outside of the presence of counsel. See also, United States v. Eastman, supra at 1019, n. 6.  Moreover, while McShane

initially told the Defendant that he could not call his lawyer, he immediately told the

Defendant that if he wanted to speak with his attorney, that it was well within his

rights to do so, and that if he did, he could not then speak to the officers.

Moreover, we are mindful that, in <u>Davis</u>, the Supreme Court did not require the

interviewing officers to ask clarifying questions following an equivocal invocation of

counsel, but certainly did not prohibit such a limited inquiry.  As the Court explained:

> Of course, when a suspect makes an ambiguous or
> equivocal statement it will often be good police practice for
> the interviewing officers to clarify whether or not he
> actually wants an attorney. * * * Clarifying questions help
> protect the rights of the suspect by ensuring that he gets an
> attorney if he wants one, and will minimize the chance of
> a confession being suppressed due to subsequent judicial
> second-guessing as to the meaning of the suspect's
> statement regarding counsel.  But we decline to adopt a rule
> requiring officers to ask clarifying questions.

<u>Id.</u> at 461-62.

Here, both McShane and Wilson asked clarifying questions after the Defendant's

reference to a lawyer.  Notably, McShane inquired as to whether the Defendant

wanted to talk to a lawyer, or to talk to the officers, and that if he wanted to talk to his

attorney, no further discussion would take place.  To this inquiry, the Defendant asked

McShane whether, if a person made a mistake, this would be his opportunity to speak.

McShane responded that it would be.  Wilson then arrived; he advised the Defendant

of some of the evidence against him; and he told the Defendant that if he wanted a chance to talk, that Wilson would give him the opportunity to speak with the officers. The Defendant then responded, "Okay, we can talk."   Shortly thereafter, the Defendant was advised of his rights under Miranda, including his right to contact an attorney, and after stating that he understood his rights, the Defendant agreed to answer the officer's questions.  In sum, we are unable to find that "a reasonable officer in light of the circumstances would have understood" the Defendant's statement as a request to confer with counsel.  Davis v. United States, supra at 459.  Indeed, when directly questioned as to whether he wanted to speak with his attorney, the Defendant did not make such a request.

To the extent that it might be urged that the Seventh Circuit's reasoning, in United States v. Lee, supra, would reach a different conclusion, we disagree.  There, after concluding that the statement "Can I have a lawyer?," was a proper invocation of the defendant's right to counsel, the Court went on to add:  "Therefore, unless the police obtained further clarification from Lee that this was actually an unequivocal request for an attorney, they should have halted the interrogation."  United States v. Lee, supra at 626.  We construe this statement as reflecting the Court's conclusion that, while the comment of the defendant, there, properly invoked a right to counsel,

it remained sufficiently ambiguous, because an unequivocal invocation of <u>Miranda</u> would have precluded further questioning of the defendant.  However, there, the Court encouraged further questioning, reasoning as follows:

> Before proceeding with the analysis, we remind police officers of the instruction the Supreme Court offered in Davis.  "[w]hen [sic] a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."  512 U.S. at 461, 114 S.Ct. 2350.  By affirmatively establishing whether a suspect invoked counsel, police (and reviewing courts) can know precisely where they stand.  We highly encourage police to follow the advice offered by the Supreme Court and take the time to clarify such issues at the time of interrogation rather than in after-the-fact arguments before the courts.

<u>Id.</u> at 626-27.

In <u>Lee</u>, the police did not ask the defendant any clarifying questions, as McShane and Wilson did here, but engaged in conduct that was, to the Court there, a "matter of some concern."  <u>Id.</u> at 627.  Ultimately, the Court determined that any misstep in the questioning of the defendant was harmless error.  <u>Id.</u>  Accordingly, we find <u>Lee</u> to be somewhat enigmatic but, to the extent that the Court appears to have encouraged clarifying questions to the interviewing officers there, we find that encouragement consistent with the practice followed by McShane and Wilson.

More importantly, as was the case in <u>Dormire</u>, the Defendant was provided an opportunity to speak with his attorney, and he declined to do so.  See, <u>Dormire v. Wilkinson</u>, supra at 806.  While <u>Dormire</u> determined that the interrogating officers had no obligation to ask clarifying questions, after the petitioner's statement, "Could I call my lawyer?," it did so simply because the petitioner's "statement was not an unambiguous or unequivocal request for counsel," so "the officers ha[d] no obligation to stop questioning him or to ask clarifying questions."  <u>Id.</u> at 805 n. 2, quoting <u>Davis v. United States</u>, supra at 461-62.  Accordingly, the result we reach is also consonant with the Court's holding, in <u>Dormire</u>, and we find that the Defendant's Fifth Amendment rights were not violated by the officers' continued questioning of the Defendant, and clarifying his intent as to the presence of counsel.

We also find the Defendant's statements to be voluntary, and without inducement by either threats or promises.  The officers did not use subterfuge, or coercive tactics, but explained to the Defendant the information which, in their view, incriminated the Defendant.  Having been so informed, and been advised that Federal charges were at least being contemplated, the Defendant responded to the officers' questions appropriate to the inquiry being asked, and never asked that the questioning

stop, or that he be permitted to consult an attorney before answering any specific question.

Therefore, we recommend that the Defendant's Motion to Suppress Statements be granted to the extent that the Defendant may have made incriminating statements in response to McShane' inquiry as to where the Defendant got the narcotics, or to McShane's statement that he knew that the silver Monte Carlo belonged to the Defendant, and that "it," referring to the narcotics that were discovered in the vehicle, also belonged to the Defendant.   In all other respects, we recommend that the Defendant's Motion to Suppress Statements be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Defendant's Motion to Suppress Evidence of Search [Docket No. 16] be denied.

2.    That the Defendant's Motion to Suppress Statements [Docket No. 17] be granted, in part, and denied, in part, as further detailed in the text of this Order denied.

Dated: July 10, 2006                    s/Raymond L. Erickson
                                        Raymond L. Erickson
                                        CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than July 26, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than July 26, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.